# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
## March 13, 2024 Session

## STATE OF TENNESSEE v. IZAIHA GLEAVES

**Appeal from the Circuit Court for Rutherford County**
**No. 75CC1-2020-CR-83763        Barry R. Tidwell, Judge**

_____

### No. M2023-00175-CCA-R3-CD
_____

The Appellant, Izaiha Gleaves, was convicted of second degree murder, attempted second degree murder, two counts of employment of a firearm during the commission of a dangerous felony, aggravated assault, and tampering with evidence. The trial court imposed an effective sentence of forty-nine years' confinement. On appeal, the Appellant argues: (1) the evidence is insufficient to support his convictions; (2) the trial court erred when it failed to excuse a juror who had a conflict of interest; (3) the trial court erred when it admitted a redacted recording of a witness interview; (4) the trial court's cumulative errors warrant reversal; and (5) the trial court erred when it imposed an effective sentence of forty-nine years.[1] After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal) and Michael Auffinger, Murfreesboro, Tennessee (at trial) for the appellant, Izaiha Gleaves.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Eric Farmer and Matt Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

---

[1] We have reordered the Appellant's issues for clarity.

This case stems from a group altercation in a church parking lot on September 1, 2018, during which the Appellant shot Michael Roper and J.L., killing Mr. Roper and paralyzing J.L.[2]  The altercation began when the Appellant's roommate, Kamya Brown, started arguing with the victims' friend, Jeremiah Wade, because he owed her money.  Ms. Brown threw a cup of water at Mr. Wade, and Mr. Wade moved toward her.  Ms. Brown's friend William Reyes intervened and pushed Mr. Wade away from Ms. Brown.  Mr. Roper and J.L. came to Mr. Wade's defense and pushed Mr. Reyes.  The Appellant then fired multiple gunshots, hitting Mr. Roper and J.L.  Though Mr. Reyes and another witness, Nick Souksavong, claimed that one of the victims was holding a gun to Mr. Reyes's face when the Appellant fired, the majority of the witnesses disputed this claim.  The Appellant was charged with second degree murder, attempted second degree murder, two counts of employment of a firearm during the commission of a dangerous felony, three counts of aggravated assault, and tampering with evidence.

**Trial**.  At trial, the Appellant was convicted as charged.  Twelve witnesses testified for the State, and two witnesses testified for the defense.  The proof relevant to the issues raised in this appeal is summarized below.

Officer Cormac Chandler of the Murfreesboro Police Department ("MPD") testified that he responded to the scene of the shooting which was "just chaos."  He was directed to the two gunshot victims.  He focused his attention on Mr. Roper, who was unresponsive and had "numerous penetrating chest wounds."  Officer Chandler attempted to control the bleeding and applied a chest seal.  However, Mr. Roper's chest was not rising and falling, which meant that at least one of his lungs had partially collapsed.  Officer Chandler began chest compressions and loaded Mr. Roper into the ambulance.

Jacob Fuhrer, a paramedic for Rutherford County Emergency Medical Services, responded to the scene and assessed J.L. while his partner assessed Mr. Roper.  He asked J.L. where he was hurting, and J.L. kept repeating that he could not feel his legs.  After removing J.L.'s shirt, Fuhrer discovered J.L. had "some penetrating traumas to his chest."  He placed two chest seals on J.L. and helped load him into an ambulance.  His partner had loaded Mr. Roper into their ambulance, and he transported Mr. Roper to the hospital.  During transport, his partner was trying to resuscitate Mr. Roper, who did not have a pulse.  Mr. Roper had penetrating injuries to his chest, left leg, and right arm.

Sergeant Katrina Henderson testified that she worked in MPD's Forensic Services Unit and responded to the scene.  When she arrived, she told another officer to take photographs of the scene, which were admitted into evidence.  She observed two vehicles, twelve spent shell casings, bloody clothes, and shoes.  Eleven of the spent shell casings

---

[2] It is the policy of this court to refer to minor victims by their initials.

were ejected from a nine millimeter firearm, and one was ejected from a .45 caliber firearm. Sergeant Henderson located a .45 caliber Glock firearm and a .25 caliber Phoenix firearm in the grassy area at the far end of the parking lot. The .45 caliber Glock firearm had a bullet in the chamber and twelve bullets in the magazine, which could hold up to thirteen bullets. The .25 caliber Phoenix firearm had a bullet in the chamber and five bullets in the magazine, which could hold up to six bullets. No nine millimeter firearm was recovered from the scene.

Doctor Thomas Deering, the Deputy Chief Medical Examiner for Metro Nashville, testified that Mr. Roper's death was caused by multiple gunshot wounds. He discovered seven different wound paths—three in the torso, two in the right arm, and two in the left leg. The seven paths did not necessarily mean Mr. Roper was shot seven times, as one bullet could have moved through his arm and then entered his torso.

Ms. Brown testified that at the time of the offense, she was a student at Middle Tennessee State University and lived in an apartment with the Appellant, Martia Shaw, and Mr. Reyes. She had only known the Appellant for "a few weeks." On the day of the offense, she was at the apartment with the Appellant, Ms. Shaw, Mr. Reyes, Andy Collins, Mr. Souksavong, Elijah Roberson, and Mikaela Lifford. The group left in two separate cars to go to a house party. They parked both of the cars in a church parking lot and began walking toward the house. On their way, they ran into Mr. Roper, J.L., and Mr. Wade. Ms. Brown and Mr. Wade had been "seeing" each other during the summer and were "not on the best of terms." The conversation "started out friendly." Mr. Roper, J.L., and Mr. Wade said there was "nothing really going on" at the party, so Ms. Brown and the others returned to their cars.

Ms. Brown said she then "escalate[d] the situation by beginning an argument with [Mr. Wade]" because he owed her money. The argument got heated when Mr. Wade called her a "b****." She threw a water bottle at him, and he "was kind of acting like he was going to come toward[] [her]." Everyone got out of the cars and began arguing. Mr. Reyes "put his hand up" and told Mr. Wade he was "not going to put [his] hands on a lady." J.L. and Mr. Roper stepped up, and Mr. Roper said something like, "[D]o you want to get popped?" At one point, things "kind of deescalated" and people began walking away. However, the commotion started again, and Mr. Roberson took Ms. Brown back toward the car. Ms. Brown heard a gunshot and ran to see what was going on. She saw the Appellant holding a gun. He fired one or two more shots, but she did not see who he was firing toward. Everyone "took off." Mr. Souksavong and the Appellant got in the car and left. As they left, Mr. Wade came from behind a tree, picked up a gun, and fired at the car. She never saw Mr. Roper or J.L. with a gun. After the shooting, the Appellant reached out to her and said she "[knew] the truth" and he was "just trying to protect [them]." He apologized "for putting [them] in that position." After being shown the statement she gave

to police two days after the offense, she indicated that the Appellant did make statements "about everyone's story being the same."

Mr. Roberson testified that he was friends with Ms. Shaw and was at her apartment the day of the offense. He did not know the other people at the apartment. They all decided to go to a party, and he drove a couple of people. He did not remember who drove the other car. They parked in a church parking lot and walked toward the house where the party was. Ms. Brown saw a man that she previously dated leaving the party, and they began arguing about money. The group decided to leave, and Mr. Roberson got in the car. When things escalated, he got out, grabbed Ms. Brown, and brought her back to the car. When they got to the car, he heard gunshots. He ran behind the church. He and Mr. Reyes then ran from the area. He never saw anyone with a gun. Ms. Shaw contacted him and advised him to come to the police station. Before he went to the police station, the Appellant reached out to him and Mr. Reyes on Instagram to see if they had spoken to the police. On cross-examination, Mr. Roberson indicated that he did not see "anyone put their hands on another person" and did not hear any threats.

Ms. Shaw testified that she did not know the Appellant before they became roommates one month before the offense. On the night of the offense, the group was walking to the party and ran into Mr. Roper, J.L., and Mr. Wade. She worked with Mr. Wade, and she knew Mr. Roper because they had both been athletes in Rutherford County. "Nothing was going on" at the party, so they started walking back toward their cars. Ms. Brown and Mr. Wade started arguing about "love stuff and him owing her something." Ms. Shaw was trying to calm everyone down and get them in the car. After everyone got in the car, Ms. Brown got out and started arguing with Mr. Wade at the window of his car. Mr. Wade got out of his car, and Ms. Brown threw a water bottle at him. Things began to escalate. Mr. Wade did a "slight lunge" toward Ms. Brown, but he did not hit her. Mr. Reyes approached Mr. Wade because he thought Mr. Wade was going to hit Ms. Brown. Mr. Roper and J.L. came to "back [] up" Mr. Wade.

Ms. Shaw said she walked toward Mr. Roper, J.L., and Mr. Wade to calm them down. They started "pushing [and] shoving" and moving toward Mr. Souksavong's car. Ms. Brown and Mr. Roberson walked toward Mr. Roberson's car. Then, the Appellant got out of Mr. Souksavong's car "saying stuff or yelling." Ms. Shaw saw the Appellant shoot toward Mr. Wade, Mr. Roper, and J.L. When the Appellant started shooting, Mr. Roper was "still bickering" and "pushing toward[] [Mr. Reyes]" but did not have a gun. Ms. Shaw took cover in Mr. Roberson's car. The Appellant got in Mr. Souksavong's car and left. Mr. Roper and J.L. were lying on the ground. As the car drove away, Mr. Wade grabbed a gun from Mr. Roper's pocket and fired at the car. Ms. Shaw never saw anyone with a weapon before the Appellant started shooting. On cross-examination, Ms. Shaw

acknowledged that she initially told police she did not see the Appellant shoot because she had difficulty talking about the incident.

Mr. Wade testified that he met Mr. Roper and J.L. on the day of the offense to go to a party. They drove to the party and parked in a nearby church parking lot. When they discovered there were not very many people at the party, they walked back to their car. As they walked, they passed Ms. Brown and her friends. When they returned to the car, Ms. Brown knocked on the window aggressively. When Mr. Wade got out of the car, she threw a "Sonic cup with ice in it" at him. They "shared words with each other." Three or four guys walked up and they all "[got] into [] a slight pushing and shoving." Mr. Wade looked to his right and saw J.L.'s gun "in his waist line." He did not see J.L. point the gun at anyone. He then looked to his left, saw the shooter pull out his gun, and ran. After the shots stopped, he ran back to where Mr. Roper and J.L. were. J.L.'s gun was lying on the ground, and Mr. Roper's gun was "by his pocket." Mr. Wade picked up J.L.'s gun and fired it at the car once before the gun jammed. He then moved the two guns because J.L. wanted them away from him. After retrieving his car from Mr. Roper's house, he went to the police station.

Mr. Wade acknowledged that he did not initially tell police that he saw J.L.'s gun, that he moved the guns, or that he had a previous relationship with Ms. Brown. Eventually, during the first interview, he told police about moving the guns and about his relationship with Ms. Brown. He did not tell police he saw J.L.'s gun until a later date. On cross-examination, he acknowledged that he called Ms. Brown "the B word" and "jumped at her" after she threw the cup. He also acknowledged that he did not tell police he fired one of the guns.

Agent Jessica Hudson of the Tennessee Bureau of Investigation testified that the eleven spent casings recovered from the scene were all fired from the same unknown nine millimeter firearm. The remaining spent casing was fired from the .45 caliber Glock firearm recovered from the scene. Both the .45 caliber Glock firearm and the .25 caliber Phoenix firearm were in normal operating condition.

Sergeant Tommy Massey of the MPD testified that he investigated the offense and received information that the firearm used was disposed of near exit 52 or 62 of Interstate 24. He and another officer searched the area but did not find the firearm.

J.L. testified that he was seventeen at the time of the offense and he and Mr. Roper "were like best friends." On the night of the offense, he and Mr. Wade were at Mr. Roper's house. Mr. Roper took them to a party. They parked in a church parking lot and walked to the party. They stayed "maybe five minutes" because there were not many people there. When they returned to their car, a woman approached Mr. Wade. She and Mr. Wade had

a "confrontation" about money. Mr. Roper and J.L. were sitting in the car and kept telling Mr. Wade they needed to leave. J.L. saw the woman, who appeared drunk, throw water on Mr. Wade. Mr. Wade "push[ed] her off of him or something of that nature," and men "start[ed] approaching behind her." His instinct was to defend Mr. Wade, so he and Mr. Roper got out of the car. Mr. Roper and J.L. pushed two men off of Mr. Wade. J.L. heard gunshots and "hit the ground." He did not see who shot him. He saw Mr. Roper lying next to him struggling to breathe. Everyone except Mr. Wade and two women left. J.L. was flown to the hospital and had three surgeries. As a result of the gunshot wounds, he is paralyzed from the chest down.

J.L. said he had a .45 caliber Glock firearm in his waist band, but he never touched it during the altercation. He never saw Mr. Roper touch his gun. He acknowledged that he told Mr. Wade to get the gun away from him. He remembered seeing Mr. Wade pick up his gun and hearing a gunshot, but he did not see Mr. Wade shoot. He acknowledged that marijuana was found in Mr. Roper's car. He said the marijuana was his, but they had not smoked any before the shooting. On cross-examination, he said there were ten grams of marijuana. He also said he had around five thousand dollars in his pocket at the scene. On redirect examination, he denied selling drugs and claimed the money was from repairing and selling four wheelers and dirt bikes. The State concluded its proof.

Mr. Reyes testified for the defense that at the time of the offense he lived with Ms. Brown, Ms. Shaw, and the Appellant. On the night of the offense, they decided to go to a party. He rode in a car with the Appellant, Mr. Collins, and Mr. Souksavong. Ms. Brown, Ms. Shaw, Mr. Roberson, and Ms. Lifford rode in the other car. They parked in the church parking lot and started walking to the party. As they were walking, "some people" told them the party was "dead," so they returned to the church parking lot. They were standing by their cars trying to figure out what to do. Mr. Wade was in another car in the parking lot. Ms. Brown and Mr. Wade started arguing "because he did not want to pay her back [] the money that she had lent him[.]" At some point, Ms. Brown "[got] put back into the back seat of the car that she [] came in." However, Ms. Brown got out of the car again and the situation escalated. She threw a cup of water in Mr. Wade's face. Mr. Wade "looked like he was about to jump on [Ms. Brown]," so Mr. Reyes put his hand out and told Mr. Wade he was not going to put his hands on a woman. Two of Mr. Wade's friends pushed Mr. Reyes and said, "[Y]ou are not going to touch my brother." One of them reached into his pocket and pulled out a small caliber firearm. Mr. Reyes put his hands up and started walking back. The two men walked him toward the car "with the gun in [his] face." One of them asked if he "want[ed] to get popped tonight" and told him to get back in the car. He heard a gunshot and ran.

On cross-examination, Mr. Reyes acknowledged that he was still friends with the Appellant and lived with him a couple of months ago. He said that though he initially ran

after the shooting, he went to the police station later that night. The Appellant tried to call him before he went to the police station, but he did not answer. He denied receiving any messages from the Appellant. The State then confronted Mr. Reyes with several inconsistencies between the transcript of his initial police interview and his trial testimony.[3] After Mr. Reyes denied making several of the statements, the State requested to play the recorded interview. Citing Tennessee Rule of Evidence 613(b), the trial court granted the request and directed the State to play the recording on recross-examination. On redirect examination, Mr. Reyes emphasized that he was confident that a gun was pointed at him.

On recross-examination, Mr. Reyes's recorded interview was admitted into evidence and played for the jury. In the interview, Mr. Reyes's initial statements are consistent with his trial testimony, including his testimony that the man had a gun in his face. After an officer told Mr. Reyes that no one else saw anyone besides the Appellant with a gun, they went over the incident again. Mr. Reyes said the man had a gun and asked if he wanted to get "popped." The officer said, "How do you know he's got a gun?" Mr. Reyes responded, "Because he was telling me you want to get popped." The officer said, "You don't see the gun yet but he asks you if you want to get popped?" Mr. Reyes responded, "Yea." Mr. Reyes described being pushed back toward the car and hearing shots. He says, "I don't know who fired first. I don't even really, really know if he had a gun." The officer said, "The only person you see for sure with a gun is who?" Mr. Reyes responded, "[The Appellant]." The officer directed Mr. Reyes to write a written statement and left the room.

During a bench conference, the State told the court that this was a "natural stopping point" in the recording, and the court adjourned for the day. After the jury exited the courtroom, the parties discussed a potential redaction of the recording in the following exchange:

| [State:] | Judge, just briefly. I'm not sure of the end of this recording if the detective starts talking to the witness about a gun that was found at the apartment two weeks prior. I will look at it. If they do mention that, I will redact that and have a copy ready for tomorrow. |
|---|---|
| [Judge:] | All right. Very well. |
| [Defense Counsel:] | That's fine. |
| [Judge:] | I suppose there is no objection to that? |

---

[3] The transcript was not admitted into evidence.

[Defense Counsel:] No, that will be fine.

Before trial resumed the following morning, the State said, "Judge, we have redacted this video. There were seconds of it where they talk about a gun being found at the apartment."

The trial resumed, and the State continued playing the recording for the jury. The State noted that it was skipping through the portion of the video where Mr. Reyes was writing his first statement. The recording shows that after Mr. Reyes completed his written statement, the officer wrote out questions for Mr. Reyes to answer in writing. They discussed Mr. Reyes's answers, and Mr. Reyes maintains that one of the men who got shot had a gun in Mr. Reyes's face. The trial transcript reflects that there was an issue with the volume of the recording, and at some point, the State said, "If we can't hear, I will just stop it here." Defense counsel said, "Technical difficulties are one thing. But as long as the jury has the ability to hear the whole thing if they so choose." The court responded, "They will. All right." The record does not reflect the point at which the recording was stopped.

When questioned by the State, Mr. Reyes acknowledged that his first written statement did not say that someone had a gun in his face. His second written statement, in which he answered specific questions, said that the man who got shot pointed a gun at him.

Mr. Souksavong testified that he had only met the Appellant once or twice before the night of the offense. As the group walked toward the house party, they saw that people were leaving and decided to go back to their cars. The other group of people he did not know was walking behind them. When he got to his car, he heard yelling and arguing on the other side of the car. Ms. Brown threw a cup of water at a man, and the man "kind of pushed her." Mr. Reyes "stepped in and said don't touch a female like that." The man's friend, who he later learned was Mr. Roper, started pushing Mr. Reyes back. They "went up against" Mr. Souksavong's car, and Mr. Souksavong saw Mr. Roper "with a gun to [Mr. Reyes's] face." Mr. Roper said, "[D]o you want to die tonight?" "[A] shot went off somewhere," and everyone dispersed. After the shots, Mr. Souksavong ran to his car because he was scared. As he was trying to leave, the Appellant "hopped in the back of [his] car."

On cross-examination, Mr. Souksavong acknowledged that he told the State in an interview approximately two months before trial that he also saw either J.L. or Mr. Wade point a gun at Mr. Reyes's head and pull the trigger. He said that after the shooting, he drove toward Nashville. He had an issue with his car and stopped on the right shoulder somewhere around exit 62. The Appellant got out of the car and "went somewhere into some trees." He acknowledged that he told police that the Appellant dropped the gun on the side of the interstate. The defense concluded its proof.

After the alternate juror was selected but before the jury began deliberations, another juror (Juror) "relayed a message" to the trial court's law clerk that said, "I need to speak to the Judge. I have made a mistake." The Juror returned to the courtroom and was questioned by the court. He said he worked with a Gerald Wade six or seven years ago, whom he believed might be State witness Jeremiah Wade's grandfather. He realized this potential relationship when he saw a woman in the courtroom who looked like Gerald Wade's daughter. The following exchange occurred:

| | |
|---|---|
| [Juror:] | I don't want to make a mistake and put myself in – I mean, I can be biased. But I just want you – |
| [Judge:] | You can be biased? |
| [Juror:] | I can. I mean, but that's, I mean, seven years to now, and I think – |
| [. . .] | |
| [Judge:] | . . . Let me ask you this. Working with someone seven years ago, would that affect whether or not you could be fair and impartial in your deliberations? |
| [Juror:] | I can. But I want you to know that. |
| [Judge:] | You can be what? |
| [Juror:] | I can be fair. |
| [Judge:] | Will you be? |
| [Juror:] | Yes, sir. I will. |
| [Judge:] | Okay. |
| [Juror:] | I promise you that. I mean, I'm not going to – |
| [Judge:] | So you are relating this information simply because you thought of it a few minutes ago? |

[Juror:]                                    And I'm – she looks – just to be honest, she looks
                                            like my friend's daughter.  And I thought that
                                            might be her son.  And I don't know.  I just
                                            wanted to check.  I wanted to verify.

After brief questioning by the State, the Juror said, "I want to be fair to you all.  And I can
be fair to what you all brought me in here to do."  When questioned by defense counsel,
the Juror indicated that he and Gerald Wade "were very good friends" but he had not talked
to him "in a while."  He again reiterated that he "can be fair and uphold the justice."  After
the Juror exited the courtroom, the State said that the Juror was pointing toward Mr.
Roper's mother and J.L.'s mother, neither of whom was related to Jeremiah Wade.

        The trial court noted that the Juror said he could be fair and impartial, and he only
brought the situation to the court's attention "out of an abundance of caution."  Defense
counsel requested that the court substitute the alternate juror, who was sitting in chambers,
for the Juror because he had a connection to the family of one of the victims.  The State
emphasized that the Juror's friend was not actually related to Jeremiah Wade and the Juror
assured the court he could be fair and impartial.  The court denied the substitution request.
The Juror returned, and the court said, "Mr. [Juror], I don't believe who you think you
know is who you think you know.  And, so, based on your answers that you can be fair and
impartial, I'm going to leave you on the jury[.]"  The jury then began deliberations.

        The jury convicted the Appellant as charged of second degree murder, attempted
second degree murder, two counts of employment of a firearm during the commission of a
dangerous felony, three counts of aggravated assault, and tampering with evidence.  The
trial court merged the aggravated assault conviction against Mr. Roper with the second
degree murder conviction, and the aggravated assault conviction against J.L. with the
attempted second degree murder conviction.

        **Sentencing Hearing**.  The trial court conducted a sentencing hearing and imposed
an effective sentence of forty-nine years' confinement.  The trial court admitted the
presentence report, which showed that the Appellant was eighteen years old when he
committed the instant offenses.  It also showed that fifteen days before the offenses, he
received "[one] year diversion—supervised probation" for possession of marijuana, theft
of property, and attempted employment of a firearm during the commission of a dangerous
felony.  Before the hearing, the Appellant's probation had been revoked and judgments of
conviction had been entered.

        J.L.'s mother testified that her son had undergone extensive therapy since the
Appellant shot him but remained paralyzed.  She said the Appellant took two lives—Mr.
Roper's and "[t]he life that we knew [J.L.] could have had."  Michelle Roberts, Mr. Roper's

mother, testified that her son was nineteen years old when the Appellant killed him. He had just moved into his dorm at Tennessee State University and hoped to play football there. She said the Appellant had "never shown any remorse for what he did" and had made Instagram posts and rap songs glorifying Mr. Roper's death while out on bond. One song said "the next time he'll never have a witness."

Sasha Terry, the Appellant's mother, testified that she was "extremely surprised" when she learned about the shooting because the Appellant was not violent. She said the Appellant had expressed remorse and had grown as a person. The Appellant testified that while he was out on bond, he followed strict bond conditions and went to therapy. He "grew up around guns" and was shot in the face at age seventeen in a botched robbery. That shooting traumatized him and left him "in a state of paranoia." When discussing the instant shooting, the Appellant said he was scared for his life and was trying to protect his friends. He said he was "sincerely sorry" and hoped that Mr. Roper's mother and J.L.'s mother could forgive him. On cross-examination, he acknowledged that the botched robbery was "a drug deal gone wrong." He also acknowledged that he was prohibited from possessing a firearm while on probation.

After hearing the above testimony, the trial court sentenced the Appellant as a Range I offender to the maximum within-range sentences for each conviction—twenty-five years for second degree murder, twelve years for attempted second degree murder, six years for each count of employing a firearm during the commission of a dangerous felony, six years for each aggravated assault, and six years for tampering with evidence. The court first noted that it had considered each of the factors enumerated in Tennessee Code Annotated section 40-35-210(b). The court applied enhancement factors (1), (3), and (13) to each of the Appellant's convictions. See Tenn. Code Ann. § 40-35-114. The court applied enhancement factor (6) to each of the Appellant's convictions except for the aggravated assault conviction against Mr. Wade and the tampering with evidence conviction. See id. The court applied no mitigating factors. When discussing the potential applicability of mitigating factors, the court noted that though the Appellant was ordered not to possess a gun two weeks before the shooting, he chose to possess a gun, carry it with him, shoot the victims, and then dispose of it.

The trial court ordered partial consecutive sentencing, resulting in an effective sentence of forty-nine years' confinement. As required by Tennessee Code Annotated section 39-17-1324(e)(1), the court ordered that each of the Appellant's six year sentences for employing a firearm during the commission of a dangerous offense run consecutively to the sentence for the underlying dangerous felony. The court then ordered that the combined sentences—thirty-one years for second degree murder and employment of a firearm during the commission of a dangerous offense, and eighteen years for attempted second degree murder and employment of a firearm during the commission of a dangerous

offense—be served consecutively based on its finding that the Appellant was a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4). The court explained that the circumstances of the offense were "aggravated" based on Mr. Roper's death and J.L.'s paralysis. The court found that consecutive sentences were reasonably related to the severity of the offenses based on the "severity of the damages to the two young men today." The court commented that "none of this had to have happened but for, [the Appellant] went armed on that night." The court also found that the sentence was necessary to protect the public against further criminal conduct of the Appellant because he had demonstrated an "unwillingness to lead a productive life." The court noted that the Appellant was involved in "two prior incidents involving guns" including the drug deal and the incident underlying his prior convictions. The remaining sentences were aligned concurrently.

The Appellant filed a motion for new trial, which the trial court denied. This timely appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence**. The Appellant argues that the evidence is insufficient to support his convictions because no reasonable jury could have determined that the Appellant was not acting in defense of Mr. Reyes. The State responds that the jury, as the arbiter or credibility, could have determined that neither Mr. Roper nor J.L. displayed their weapons before the Appellant fired at them. We agree with the State.

When evaluating the sufficiency of the evidence, this court must determine "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Because a guilty verdict removes the presumption of innocence and imposes a presumption of guilt, the Appellant bears the burden of showing why the evidence is insufficient to support the verdict. Id. (citing State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006)). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The jury evaluates the credibility of witnesses, determines the weight given to their testimony, and reconciles all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Appellant was convicted of second degree murder, attempted second degree murder, two counts of employment of a firearm during the commission of a dangerous

felony, aggravated assault, and tampering with evidence. Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210. A person commits attempted second degree murder when he knowingly "acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3). It is also an offense to employ a firearm during the commission or attempt to commit a dangerous felony. Id. § 39-17-1324. A person commits aggravated assault when he intentionally or knowingly causes another to reasonably fear imminent bodily injury while using or displaying a deadly weapon. Id. §§ 39-13-102(a)(1)(A)(iii), -101(a)(2).

Because the trial court found that defense of another was fairly raised by the proof, the State was also required to prove that the Appellant did not act in defense of another. State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013) (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). "The application of the right to defend another should be 'determined in the same fashion as the right of self-defense[.]'" Id. at 128 (quoting Tenn. Code Ann. § 39-11-612 Sent'g Comm'n Cmts.). At the time of the offense, the self-defense statute provided:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (2017). If a person would be justified in using force to protect himself under section 39-11-611(b)(2), he would also be justified in using force to protect a third person if he reasonably believed that the force was immediately necessary to protect the third person. Id. § 39-11-612.

The evidence is sufficient to support the Appellant's convictions because a rational jury could have rejected the Appellant's defense of another claim. Viewed in the light most favorable to the State, the evidence established that the Appellant's belief that Mr. Reyes was in imminent danger of death or serious bodily injury was not reasonable. Though Mr.

Reyes and Mr. Souksavong testified that one of the victims was pointing a gun at Mr. Reyes before the Appellant fired, this testimony conflicted with the testimony of five other witnesses including the surviving victim. Neither Ms. Brown, Mr. Roberson, Ms. Shaw, nor Mr. Wade saw either of the victims point a gun at Mr. Reyes. J.L. testified that he never touched the gun in his waistband, and never saw Mr. Roper touch his gun. Additionally, both Mr. Reyes and Mr. Souksavong admitted on cross-examination that they made prior statements that were inconsistent with their trial testimony. Mr. Reyes, in his first written statement, did not mention that a gun was pointed at him. Mr. Souksavong, in a pretrial interview with the State, said he saw two guns pointed at Mr. Reyes. The jury evaluated the credibility of the witnesses and resolved the conflicting testimony in favor of the State. Because the jury could have determined that neither Mr. Roper nor J.L. pointed a gun at Mr. Reyes prior to the Appellant's firing a gun, the evidence is sufficient to support his convictions.

**II. Juror Disqualification**. The Appellant argues that he was deprived of his right to be tried by an impartial jury because the trial court failed to excuse the Juror, who believed he had previously worked with a family member of Jeremiah Wade and "twice stated that he believed that he would be biased in the deliberations." He contends that the Juror's bias in favor of Jeremiah Wade was "of particular significance" because Jeremiah Wade's testimony contradicted the Appellant's claim that he acted in defense of Mr. Reyes. The State responds, and we agree, that the Appellant has failed to establish that the Juror was biased because he has not shown any connection between the Juror and Jeremiah Wade.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Every defendant is assured "a trial by a jury free of ... disqualification on account of some bias or partiality toward one side or the other of the litigation." State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)). If the court determines that a juror is "unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict," the juror shall be replaced with an alternate juror. Tenn. R. Crim. P. 24(f)(2)(B). "The determination of whether a juror is unable or disqualified to perform his duties lies within the sound discretion of the trial court." State v. Goltz, 111 S.W.3d 1, 5 (citing State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995)). The trial court's determination will not be overturned absent an abuse of discretion. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989) (citing Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979)). Whether the constitutional right to an impartial jury has been violated, however, is a mixed question of law and fact which we review de novo, granting a presumption of correctness only to the trial court's findings of fact. State v. Adams, 405 S.W.3d 641, 656 (Tenn. 2013) (citing Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001)).

The trial court's determination that the Juror was not disqualified from performing his duties was not an abuse of discretion. Though the Juror initially stated that he "can be biased," he then repeatedly stated unequivocally that he would be fair and impartial. The trial court, having observed the Juror's demeanor and assessed his credibility, determined that he was not disqualified. In addition, the trial court determined that the Juror's former friend was not related to Jeremiah Wade. The court reassured the Juror, "I don't believe who you think you know is who you think you know." This reassurance that his former friend was not related to Jeremiah Wade eliminated any remaining concern about potential bias. Accordingly, the trial court did not abuse its discretion by declining to replace the Juror with an alternate juror.

Additionally, the Appellant was not deprived of his right to be tried by an impartial jury. The Appellant argues that we should presume that the Juror was biased because he stated, "I can be biased." See Smith v. State, 357 S.W.3d 322, 348 (Tenn. 2011) ("We have never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias[.]"). However, this court has previously recognized that "a presumption of bias may in some cases be dispelled by an absence of actual partiality." Akins, 867 S.W.2d at 357. We find no actual partiality in this case based on: (1) the Juror's repeated and unequivocal statements that he could be fair and impartial despite his former friendship with a person he believed might be Jeremiah Wade's grandfather; and (2) the trial court's reassurance to the Juror that his former friend was not related to Jeremiah Wade. Accordingly, the Appellant is not entitled to relief.

**III. Incomplete Recording**. The Appellant argues that the trial court violated Tennessee Rule of Evidence 106 because the State redacted portions of Mr. Reyes's police interview and the interview "was not played in its entirety." He concedes that he failed to object at trial but contends that he is entitled to relief under the plain error doctrine. The State responds that he is not entitled to relief because it is unclear what occurred in the trial court and consideration of the alleged error is not necessary to do substantial justice. The State contends that the entire interview was played for the jury, "with the possible exception of a minor redaction about a gun that was found at the apartment two weeks prior." We conclude that the Appellant is not entitled to plain error relief.

Tennessee Rule of Evidence 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." This rule allows the trier of fact "to assess related information without being misled by hearing only certain portions of evidence." State v. Keough, 18 S.W.3d 175, 182 (Tenn. 2000) (citing Neil P. Cohen et

al., Tennessee Law of Evidence § 106.1, at 33 (3d ed. 1995)). The Appellant challenges the admission of the redacted statement for the first time in this appeal. Accordingly, we are limited to reviewing the alleged error under the plain error doctrine. See Tenn. R. App. P. 36(b).

The plain error doctrine provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Id. An error is "plain" if the Appellant establishes each of the following factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The Appellant must also establish that the error was "of such a great magnitude that it probably changed the outcome of the trial." Id. at 283 (quoting Adkisson, 899 S.W.2d at 642). "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. This court has previously noted that "only 'rarely will plain error review extend to an evidentiary issue.'" State v. Haymer, 671 S.W.3d 568, 578 (Tenn. Crim. App. 2023) (quoting State v. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007), no perm. app. filed).

The Appellant has not established that a clear and unequivocal rule of law has been breached because he has not shown how the jury was misled by the redaction of Mr. Reyes's recorded interview. The State said during the trial that it redacted a portion of the recording where Mr. Reyes and the officer "discuss a gun that was found at the apartment two weeks prior." Because the Appellant did not object to this redaction and make an offer of proof, only the redacted copy of the interview is included in the record. In support of his argument that the redaction misled the jury, the Appellant argues only that "the jury was left with the impression that Mr. Reyes was confused between his trial testimony and his pretrial statement as well as the fact that the detective, during the interview, is unequivocal that he believes Mr. Reyes is being untruthful and may be charged as an accomplice." The discovery of a gun at the Appellant's and Mr. Reyes's shared apartment before the instant offenses, however, was not related to Mr. Reyes's trial testimony and does not suggest that Mr. Reyes was an accomplice. As the State points out, the

- 16 -

introduction of the redacted portion, if anything, would have harmed rather than helped the Appellant's defense.

Though the Appellant also complains that the recording "was not played in its entirety" due to volume issues, Rule 106 requires only that the recording be <u>introduced</u>. Tenn. R. Evid. 106. The entirety of the recording, minus the redacted portion mentioned above, was introduced and provided to the jury. Though a portion of the recording was not played, the Appellant did not request that the recording be played in its entirety and has not shown how the failure to play the remaining portion contemporaneously misled the jury. Accordingly, the Appellant is not entitled to plain error relief.

**IV. <u>Cumulative Error</u>**. Alternatively, the Appellant argues that the cumulative effect of the trial court's errors entitles him to relief. The cumulative error doctrine recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." <u>State v. Hester</u>, 324 S.W.3d 1, 76 (Tenn. 2010). Because we conclude that no error occurred, the cumulative error doctrine does not apply.

**V. <u>Sentencing</u>**. The Appellant argues that the trial court erred by imposing the maximum within-range sentences and ordering partial consecutive alignment. The State responds, and we agree, that the trial court acted within its discretion.

**A. <u>Sentence Length</u>**. The Appellant contends that the length of his sentence "fail[s] to promote any kind of rehabilitation" and is "no greater than [] deserved," nor "the least severe measure necessary." He also contends that the trial court misapplied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, to his second degree murder conviction. The State concedes that the trial court misapplied enhancement factor (6), but contends that the remaining enhancement factors and the principles of sentencing support the sentence imposed. We agree with the State.

This court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." <u>State v. Bise</u>, 380 S.W.3d 682, 707 (Tenn. 2012). The appealing party bears the burden of establishing that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sent'g Comm'n Cmts. So long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed, the sentence should be upheld. <u>Bise</u>, 380 S.W.3d at 706. Even the misapplication of an enhancement or mitigating factor, however, "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." <u>Id.</u>

The trial court must consider the following when determining the appropriate sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). The principles of sentencing require that the court impose "a sentence justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1). The court must also consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C), -103(5). The sentence must be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

We agree with the Appellant and the State that the trial court erred in applying enhancement factor (6) to the Appellant's second degree murder conviction. The trial court is prohibited from applying an enhancement factor that is an essential element of the offense. Tenn. Code Ann. § 40-35-114. The death of the victim is an essential element of second degree murder. Id. § 39-13-210. Because proof of death will always constitute proof of particularly great injury, factor (6) cannot be used to enhance the Appellant's second degree murder conviction. See State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987) (concluding that enhancement factor six could not be applied to vehicular homicide because death is an element of the offense); see also State v. Jones, 883 S.W.2d

597, 602 (Tenn. 1994) ("proof of serious bodily injury will always constitute proof of particularly great injury").

Despite the trial court's misapplication of enhancement factor (6), the trial court did not abuse its discretion in sentencing the Appellant to the maximum within-range sentences. The court also relied on enhancement factors (1), (3), and (13), the applicability of which the Appellant has not challenged. The court considered mitigating factors but found that none were applicable. The court stated that it had considered each of the other factors enumerated in Tennessee Code Annotated section 40-35-210(b). The court highlighted the severity of the harm caused by the offenses and the fact that the Appellant was prohibited from possessing a gun fifteen days before the shooting. Accordingly, the Appellant is not entitled to relief.

B. **Sentence Alignment**. The Appellant next contends that the trial court erred by ordering partial consecutive sentencing. He contends that: (1) the trial court failed to make the requisite findings to impose consecutive sentences based on the dangerous offender classification; and (2) the Appellant is not a dangerous offender. He concedes, however, that Tennessee Code Annotated section 39-17-1324(e)(1) required that each of the Appellant's six year sentences for employing a firearm during the commission of a dangerous felony run consecutively to the sentence for the underlying dangerous felony, which would amount to an effective sentence of thirty-one years. The State responds, and we agree, that the trial court did not abuse its discretion in ordering partial consecutive sentencing because the Appellant was a dangerous offender.

The abuse of discretion standard of review, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations so long as the trial court provided adequate reasons on the record. State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). Without adequate reasons, however, this court "should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." Id. at 863-64. Instead, this court "has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Id. at 864.

When a defendant is convicted of more than one offense, the trial court may order consecutive sentences if the court finds, by a preponderance of the evidence, that the defendant fits into at least one of the enumerated categories. Tenn. Code Ann. § 40-35-115(b). In this case, the trial court imposed consecutive sentences based on its finding that the Appellant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See id. § 40-35-115(b)(4). Because the dangerous offender classification is "the

- 19 -

most subjective to apply," the trial court must make two additional findings before ordering consecutive sentences based on this classification. Pollard, 432 S.W.3d at 863 (citing State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)). The trial court must find that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Id. (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Without such findings, the trial court has failed to provide adequate reasons on the record to support the imposition of consecutive sentences. Id.

The trial court provided adequate reasons on the record to support the imposition of partial consecutive sentences based on the dangerous offender classification. The court explicitly found both of the Wilkerson factors and noted the facts that supported its findings. We therefore presume the sentencing determination is reasonable and will not disturb it absent an abuse of discretion.

The Appellant has not established that the trial court abused its discretion by finding that he was a dangerous offender. The court found that the aggregate sentence was reasonably related to the severity of the offenses, emphasizing that it believed the offenses were "aggravated" given Mr. Roper's death and J.L.'s paralysis. The court expressed its concern that the Appellant, despite being prohibited from possessing a firearm, chose to possess a firearm and shoot the victims. The court also found that the sentence was necessary to protect the public against further criminal conduct of the Appellant because the Appellant had demonstrated an "unwillingness to lead a productive life." The court emphasized that the Appellant had been placed on probation fifteen days before the shooting for three offenses, including attempted employment of a firearm during commission of a dangerous felony. The court also emphasized that the Appellant admitted involvement in a drug sale "involving guns." We note that while the proof established that the Appellant was previously shot during a drug sale, it did not establish that he possessed a gun during that sale. Still, the Appellant's involvement in a drug sale was relevant to the trial court's assessment of the risk of future criminal conduct of the Appellant. Based on these facts, the trial court did not abuse its discretion, and the Appellant is not entitled to relief.

## CONCLUSION

For the above reasons, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE

- 20 -